O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOHN DOE, (a pseudonym), | ) | Case No. EDCV 13-02262 DDP (Spx) |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING IN PART AND |
| | ) | DENYING IN PART THE MOTION TO |
| v. | ) | DISMISS |
| | ) | |
| JEFFREY A. BEARD, Secretary, | ) | [DOCKET NUMBER 36] |
| The California Department of | ) | |
| Corrections and | ) | |
| Rehabilitation; et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Before the Court is Defendants' Motion to Dismiss Plaintiff's
Third Amended Complaint ("TAC"). Having considered the parties'
submissions, the Court adopts the following order and denies the
motion.

**I.    BACKGROUND**

Plaintiff was a prisoner at California Institute for Men
("CIM"), which is administered by the California Department of
Corrections and Rehabilitation ("CDCR"). He was and is HIV-
positive. In 2012, Defendant Young (a medical technician at the
prison) misplaced his medical file, which resulted in the file

being delivered to another prisoner. (TAC ¶¶ 37-42.) The other prisoner kept the file and shared its contents, including Plaintiff's status as seropositive for Human Immunodeficiency Virus ("HIV") with other prisoners. (Id. at ¶ 41.) The following day Plaintiff was made aware that his file had been delivered to another prisoner when other prisoners began taunting him about it. (Id. at ¶ 44.) One said to him, "I wouldn't want to be you now that people know what you've got," which Plaintiff alleges was a "thinly veiled threat." (Id.) Plaintiff also alleges that other inmates "taunted and threatened" him. (Id. at ¶ 45.) Plaintiff alleges that he immediately sought assistance from corrections officers (Defendants Valenzuela and Nash) in retrieving the file, but the officers declined to intervene; Defendant Valenzuela allegedly told him, "I want nothing to do with that." (Id. at ¶¶ 47, 51.) Plaintiff also alleges he sought assistance from the prison psychiatrist, who contacted a corrections officer, Defendant Botello, and explained that Plaintiff's file was in the hands of another prisoner and that Plaintiff was being taunted and threatened by other prisoners. (Id. at ¶ 53.) Defendant Botello allegedly declined to find and collect Plaintiff's records unless Plaintiff could tell him which prisoner had the records. (Id. at ¶ 54.) Plaintiff also alleges he returned to Defendant Young for assistance, but that she refused to speak with him. (Id. at ¶ 56.) Nineteen days after Plaintiff alleges he initially contacted Defendant Valenzuela for help, the records were returned, apparently by the "officer of the day." (Id. at ¶¶ 60-61.) Several months later, Plaintiff was able to obtain a meeting with Defendant Logan, who was Defendant Young's supervisor. Defendant

1   Logan allegedly apologized for the disclosure of Plaintiff's

2   records and stated that "it should never have happened." (Id. at ¶

3   59.)

4       Plaintiff's claim under 42 U.S.C. § 1983 in his First Amended

5   Complaint ("FAC") argued that releasing and then failing to

6   retrieve the medical file was a cognizable constitutional harm

7   under the Fourteenth Amendment. (FAC ¶ 1-2.) Ruling on

8   Defendants' first motion to dismiss, the Court found that

9   disclosure of medical records was a cognizable constitutional harm,

10   but not if the Defendants were simply negligent. (Dkt. No. 31 at

11   11.) Plaintiff argued in his opposition that the Defendants had

12   acted with "deliberate indifference," a mental state normally

13   associated with Eighth Amendment violations.[1] But the Court found

14   that Plaintiff had not pled facts showing that the Defendants knew

15   of and disregarded a substantial risk of serious harm, as required

16   to meet the "deliberate indifference" standard. (Id. at 14.)

17       Because Plaintiff had not sufficiently pled a constitutional

18   violation, the Court dismissed his First Amended Complaint without

19   addressing whether the right in play was "clearly established," so

20   as to defeat qualified immunity. The Court also did not reach his

21   state claim under the California Constitution's right to privacy.

22   Plaintiff has now filed a Third Amended Complaint ("TAC") alleging

23   causes of action against Defendants Young, Logan, Valenzuela, Nash,

24   and Botello under 42 U.S.C. § 1983 and against CDCR, Cate, Beard,

25   Young, Logan, Valenzuela, Nash, and Botello under the California

26   Constitution. (Dkt. No. 35.)

27   _____

28       [1]See Estelle v. Gamble, 429 U.S. 97 (1976); Farmer v. Brennan,
     511 U.S. 825 (1994).

3

1  **II.  LEGAL STANDARD**

2  In order to survive a motion to dismiss for failure to state a

3  claim, a complaint need only include "a short and plain statement

4  of the claim showing that the pleader is entitled to relief." <u>Bell

5  Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v.

6  Gibson</u>, 355 U.S. 41, 47 (1957)).  A complaint must include

7  "sufficient factual matter, accepted as true, to state a claim to

8  relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S.

9  662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544,

10  570 (2007)).  When considering a Rule 12(b)(6) motion, a court must

11  "accept as true all allegations of material fact and must construe

12  those facts in the light most favorable to the plaintiff." <u>Resnick

13  v. Hayes</u>, 213 F.3d 443, 447 (9th Cir. 2000).

14  **III. DISCUSSION**

15  **A.   Section 1983 Claim**

16  "To establish [42 U.S.C.] § 1983 liability, a plaintiff must

17  show both (1) deprivation of a right secured by the Constitution

18  and laws of the United States, and (2) that the deprivation was

19  committed by a person acting under color of state law." <u>Chudacoff

20  v. Univ. Med. Ctr. of S. Nevada</u>, 649 F.3d 1143, 1149 (9th Cir.

21  2011).  It is not in dispute here that Defendants, as prison

22  officials, acted "under color of state law."  Rather, Defendants

23  dispute that Plaintiff has alleged facts showing he was deprived of

24  a "right secured by the Constitution and laws of the United

25  States." (Mot. Dismiss at 5-12.)  In the alternative, if there was

26  a constitutional violation, Defendants argue that they are entitled

27  to qualified immunity from suit because the right was not clearly

28  established. (<u>Id.</u> at 14.)

1    **1.    Constitutional Violations**

2         Plaintiff's TAC makes a claim under 42 U.S.C. § 1983, alleging

3    that his constitutional right to privacy has been violated.  The

4    Court has already found that such a right exists, but that some

5    mental state greater than mere negligence is required to make a

6    constitutional violation cognizable under § 1983.  (Dkt. No. 31 at

7    11.)  Plaintiff does not allege that the Defendants acted or failed

8    to act with the *intent* of violating his medical privacy.  But in

9    the previous order, the Court found that there was case law

10   supporting the idea that a mental state of "deliberate

11   indifference" to "a substantial risk of serious harm" was enough to

12   state a claim for a Fourteenth Amendment Due Process Clause

13   violation.  (<u>Id.</u> at 13 (citing <u>Wood v. Ostrander</u>, 879 F.2d 583 (9th

14   Cir. 1989)).  Although Plaintiff had not, at that time, alleged

15   sufficient facts showing that Defendants actually knew of such a

16   risk, the Court left the door open for Plaintiff to argue that they

17   did in an amended complaint.

18        The right to medical privacy, though recognized by the Ninth

19   Circuit as a constitutionally protected right,[2] does not always

20   implicate the risk of "serious harm."  Often, the chief harm

21   involved will be embarrassment and annoyance.  More seriously, in

22   some cases the unauthorized disclosure of medical information might

23   affect a person's insurance rates or their employment prospects.

24   _____

25        [2]<u>Doe v. Attorney Gen. of U.S.</u>, 941 F.2d 780, 795 (9th Cir.
     1991) <u>disapproved of as to other matters by</u> <u>Lane v. Pena</u>, 518 U.S.
26   187 (1996) (holding that there is a constitutional right to privacy
     in medical information, including HIV status); <u>Norman-Bloodsaw v.</u>
27   <u>Lawrence Berkeley Lab.</u>, 135 F.3d 1260, 1269 (9th Cir. 1998) ("The
     constitutionally protected privacy interest in avoiding disclosure
28   of personal matters clearly encompasses medical information and its
     confidentiality.").

1   In some extreme cases, the revelation that a person has certain
2   diseases might result in partial or even total social ostracism.
3   But such catastrophic consequences are likely to be rare in
4   civilian life.  Thus, it is not surprising that there do not seem
5   to be any medical privacy cases decided on the deliberate
6   indifference standard in the non-prison context.
7        In the unique context of the disclosure of a prisoner's HIV
8   status, however, the constitutional violation may subject the
9   prisoner to direct acts of violence, which would obviously qualify
10  as "serious harm."  As CDCR itself has argued in a slightly
11  different context, knowledge of a prisoner's HIV-positive status
12  can be dangerous for the prisoner, because his fellow prisoners may
13  harbor irrational fears about transmission, however unlikely, and
14  because prisoners cannot simply avoid each other as civilians can.
15  Gates v. Rowland, 39 F.3d 1439, 1447-48 (9th Cir. 1994).  See also
16  Powell v. Schriver, 175 F.3d 107, 115 (2d Cir. 1999) ("[I]t was . .
17  . obvious . . . that under certain circumstances the disclosure of
18  an inmate's HIV-positive status . . . could place that inmate in
19  harm's way.").  The potential danger of violence toward HIV-
20  positive inmates lurks in the background even of cases where courts
21  have found that disclosure of HIV status was not a constitutional
22  violation.  See, e.g., Harris v. Thigpen, 941 F.2d 1495, 1518 (11th
23  Cir. 1991) ("[T]he presence of an intervening defendant class of
24  inmates in this case who oppose the release of HIV-positive
25  prisoners into the general prison population is an indicator of
26  significant opposition that could likely degenerate into active
27  violence within the Alabama system should reintegration occur.");
28  Muhammad v. Carlson, 845 F.2d 175, 178 (8th Cir. 1988) (segregation

1  of HIV-positive prisoners served legitimate security purpose);

2  Moore v. Mabus, 976 F.2d 268, 270-72 (5th Cir. 1992) (claim that

3  "guards failed to protect HIV-positive prisoners" survived even

4  where medical privacy claim was deemed "frivolous"); Anderson v.

5  Romero, 72 F.3d 518, 523 (7th Cir. 1995) (suggesting that,

6  irrespective of the medical privacy issue, it would be an Eighth

7  Amendment violation "if employees of the prison, knowing that an

8  inmate identified as HIV positive was a likely target of violence

9  by other inmates yet indifferent to his fate, gratuitously revealed

10  his HIV status to other inmates").  Indeed, in Harris, Muhammad,

11  and Moore, the right to privacy was breached precisely in order to

12  *protect* HIV-positive patients by isolating them from the general

13  population.  That is obviously a very different situation from the

14  allegations here, which suggest that Plaintiff was in danger

15  because word of his HIV status was going around in the general

16  population, of which he remained a part.

17      Interpersonal violence, in other words, is "serious harm," and

18  disclosure of HIV-positive status has the unique potential, in the

19  prison context, to result in violence.  The Court therefore finds

20  that prison officials' deliberate indifference to the risk of such

21  violence is a sufficient mental state to establish a claim under §

22  1983 for violation of medical privacy in these circumstances.[3]

23  _____

24      [3]The Court here follows the logic of Wood and its progeny,
   which firmly establish that state officers have an affirmative duty
25  to protect people from danger when state action has placed them in
   peril in the first place.  See also Maxwell v. Cnty. of San Diego,
26  708 F.3d 1075, 1082 (9th Cir. 2013); Kennedy v. City of Ridgefield,
   439 F.3d 1055, 1061 (9th Cir. 2006) Munger v. City of Glasgow
27  Police Dep't, 227 F.3d 1082, 1086 (9th Cir. 2000).  Although
   Plaintiff has framed the issue slightly differently, as a matter of
28  medical privacy, the logic of the "danger creation" cases would
                                              (continued...)

                                    7

1    Plaintiff alleges that prison officials acted with deliberate
2 indifference to a substantial risk of serious harm when they failed
3 to retrieve (or even attempt to retrieve) the itinerant medical
4 file even after Plaintiff explained that it had fallen into the
5 hands of other prisoners and that he was receiving threats based on
6 his HIV status.  Defendants Valenzuela, Nash, Botello, and Young
7 allegedly knew of the risk because Plaintiff told each of them,
8 individually, that he was the target of "repeated" "threats."  (<u>Id.</u>
9 at ¶¶ 47, 51, 53, 56.)  Defendants argue that the allegations are
10 not sufficient to establish that Valenzuela, Nash, and Young
11 subjectively knew of the danger, despite having being told of it.
12 (Mot. Dismiss at 9-10.)  The Court disagrees.  The allegation that
13 Valenzuela dismissed Plaintiff's concerns by saying that "it's a
14 legal matter" does not negate the fact that she was personally told
15 of a risk of violence to Plaintiff.  Nash and Young were also
16 personally told of the risk.  While the actual state of mind of
17 Valenzuela, Nash, and Young is ultimately a question for a jury,
18 Plaintiff's allegations raise a plausible inference that Defendants
19 knew of the risk.  Plausibility is all that is required at the
20 pleading stage.  <u>Iqbal</u>, 556 U.S. at 678.

21    Defendants also contend that Defendant Botello could not have
22 had the requisite deliberate indifference because the records were
23 returned two days after Plaintiff met with Botello about his
24 records, and because the TAC states that Botello was the only
25 officer who "attempted to retrieve the records."  (Mot. Dismiss at

26
27       [3](...continued)
seem to apply equally well to this particular kind of privacy
28 violation: state officers simply may not act with deliberate
indifference to the risks of serious harm created by state action.

10.)   But the TAC specifically says that the records were initially
acquired by "the 'officer of the day' in Joshua Hall," not by
Botello.   (TAC, ¶ 60.)   There is no indication that Defendant
Botello took any affirmative steps to secure the records prior to
that point.   Indeed, Plaintiff alleges that Botello's initial
response was a refusal to help Plaintiff unless Plaintiff first
undertook an investigation in a part of the prison he had no access
to.   (Id. at ¶¶ 54, 62.)   The TAC therefore raises a plausible
inference of deliberate indifference on Botello's part.

     As to Defendant Logan, however, the Court agrees with
Defendants that the allegations in the TAC do not show that she
violated Plaintiff's constitutional rights.   Plaintiff's primary
complaint with regard to Defendant Logan is that she did not meet
with him right away.   Assuming that an earlier meeting with Logan
would have been useful in retrieving Plaintiff's records and
reducing the risk of violence, it is not clear that Defendant Logan
understood before their meeting that Plaintiff had been threatened
with harm.   Plaintiff alleges only that he "had reported" threats
generally, not that he had communicated the threats to Logan in his
attempts to schedule a meeting with her.   (Id. at 59.)   Therefore,
although Defendant Logan may have been somewhat negligent in
waiting four months to respond to Plaintiff's request for a
meeting, it cannot be said on these allegations that she acted with
deliberate indifference.

     Plaintiff has alleged sufficient facts to state a § 1983 claim
for a constitutional violation as to Defendants Valenzuela, Nash,
Young, and Botello.   The claim is dismissed, however, as to
Defendant Logan.

1  **2.   Qualified Immunity**

2       Defendants assert qualified immunity as a defense.  "The

3  doctrine of qualified immunity protects government officials from

4  liability for civil damages insofar as their conduct does not

5  violate clearly established statutory or constitutional rights of

6  which a reasonable person would have known."  <u>Pearson v. Callahan</u>,

7  555 U.S. 223, 231 (2009).  Thus, the question here is whether

8  Defendants violated a clearly established constitutional right.

9       Defendants urge the Court to find that, even if Plaintiff had

10 a right to privacy in his medical information (and especially his

11 HIV-positive status), the right against disclosure under these

12 circumstances was not "clearly established" at the time his file

13 was left in the hands of other inmates.  The Court rejects that

14 argument.  The right to medical privacy is clearly established.[4]

15 Although that right is heavily circumscribed in prison,[5] it is also

16 ─────────────────

17      [4]<u>Nelson v. Nat'l Aeronautics & Space Admin.</u>, 530 F.3d 865, 877
   (9th Cir. 2008) <u>rev'd as to other matters</u>, 562 U.S. 134 (2011) ("We

18 have repeatedly acknowledged that the Constitution protects an
   individual interest in avoiding disclosure of personal matters.

19 This interest covers a wide range of personal matters, including .
   . . medical information . . . ."); <u>Tucson Woman's Clinic v. Eden</u>,

20 379 F.3d 531, 551 (9th Cir. 2004) ("Individuals have a
   constitutionally protected interest in avoiding 'disclosure of

21 personal matters,' including medical information.); <u>Doe v. Attorney</u>
   <u>Gen. of U.S.</u>, 941 F.2d 780, 795 (9th Cir. 1991) <u>disapproved of as</u>

22 <u>to other matters by</u> <u>Lane v. Pena</u>, 518 U.S. 187 (1996) (holding that
   there is a constitutional right to privacy in medical information,

23 including HIV status).  <u>See also</u> <u>Doe v. City of New York</u>, 15 F.3d
   264, 267 (2d Cir. 1994) ("Individuals who are infected with the HIV

24 virus clearly possess a constitutional right to privacy regarding
   their condition."); <u>Doe v. Delie</u>, 257 F.3d 309, 331 (3d Cir. 2001)

25 ("[W]e have recognized the right to confidentiality in medical
   records since 1980.").

26      [5]<u>See, e.g.</u>, <u>Seaton v. Mayberg</u>, 610 F.3d 530, 534 (9th Cir.

27 2010) ("To the extent that his constitutional claim attacks
   disclosure while he was in prison serving his sentence *and for a*

28 *penological purpose relating to his imprisonment*, Seaton's claim
                                              (continued...)

clearly established that "a prison inmate retains those
[constitutional] rights that are not inconsistent with his status
as a prisoner or with the legitimate penological objectives of the
corrections system." <u>Turner v. Safley</u>, 482 U.S. 78, 95 (1987).  A
reasonable prison official thus would have been on notice that he
or she could not violate Plaintiff's right to medical privacy
absent some legitimate penological objective.  Defendants have not
even attempted to show that their refusal to try to retrieve the
record (or otherwise mitigate the potentially dangerous effects of
the disclosure) was related to such an objective.  Finally, as
discussed in note 3, <u>supra</u>, it is clearly established that state
officials may not act or fail to act with deliberate indifference
to dangers created by state action.  Thus, although Defendants are
correct that there does not appear to be a Ninth Circuit case with
facts identical to this one, the Court finds that the above
principles all apply to this situation and were clearly
established.

     The Court finds that the Defendants do not have a defense of
qualified immunity in this case.

**B.   California Constitutional Right To Privacy Claim**

     Plaintiff alleges that the Defendants violated his
constitutional right to privacy.  Cal. Const. art. I, § 1.  Because
Plaintiff had not pled sufficient facts to establish his § 1983
claim in the FAC, the Court did not consider his California

---

[5](...continued)
falls within the body of law regarding privacy for prisoners, the
general principle being that whatever privacy right he has may be
overridden *for legitimate penological reasons*.") (emphases added).

1  constitutional claim in the previous order and addresses it here
2  for the first time.

3  **1.   Government Claims Act Immunity**

4       Defendants, as a threshold matter, assert governmental
5  immunity "afforded to public entities and employees through the
6  Government Claims Act (Cal. Gov't Code § 810 et seq.)."  (Mot.
7  Dismiss at 17:12-13.)  Although statutes generally do not trump
8  constitutional provisions, Defendants cite to two cases for the
9  proposition that statutory immunity does trump the constitutional
10 right to privacy under California law.

11      In <u>Jacob B. v. Cnty. of Shasta</u>, the California Supreme Court
12 held that the litigation privilege embodied in Cal. Civil Code §
13 47(b) protected parties against causes of action rooted in the
14 state constitutional right to privacy with regard to publications
15 made in connection with a judicial proceeding.  40 Cal. 4th 948
16 (2007).  The court noted that the constitutional right to privacy
17 was subject to interest-balancing, <u>id.</u> at 961, and that the
18 interests safeguarded by the litigation privilege were important
19 enough to outweigh the right "not on a case-by-case basis but in
20 all cases."  <u>Id.</u> at 962.

21      The <u>Jacob B.</u> court observed that the litigation privilege had
22 existed for "well over a century," and had been applied as a nearly
23 absolute privilege at least since 1956.  <u>Id.</u> at 961.  The court was
24 "not aware of[] anything in the ballot materials or history of the
25 1972 initiative that added the constitutional right to privacy that
26 suggested any intent to limit the scope of this preexisting
27 privilege."  <u>Id.</u>  Thus, the court declared that "[w]hen the voters
28 adopted California Constitution, article I, section 1, they did so

1  mindful of the preexisting litigation privilege." <u>Id.</u>  And in

2  concluding that courts did not need to conduct interest-balancing

3  on a case-by-case basis when it came to the litigation privilege,

4  the court held that "[i]n adopting the litigation privilege, the

5  *Legislature* has already done the balancing." <u>Id.</u>

6      These conclusions suffer from some logical shortcomings.  If

7  the ballot materials did not mention the litigation privilege, it

8  seems more reasonable to assume that California voters were *not*

9  mindful of it.  And it is particularly hard to see how the

10 Legislature, in statutorily codifying the litigation privilege in

11 1872, could have adequately considered a constitutional privacy

12 interest not created until a century later.  Nonetheless, the

13 court's opinion is clear, and California law is settled as to the

14 effect of Cal. Civil Code § 47 on the constitutional privacy.

15     But one California Court of Appeals has gone further, relying

16 on <u>Jacob B.</u> and holding broadly that "[t]he constitutional right to

17 privacy does not limit the scope of a preexisting statutory

18 immunity," including immunity under the provisions of the

19 Government Claims Act ("GCA").  <u>Richardson-Tunnell v. Sch. Ins.</u>

20 <u>Program for Employees (SIPE)</u>, 157 Cal. App. 4th 1056, 1066 (2007).

21 The court there noted that "[t]he voter information materials for

22 the 1972 initiative demonstrate the intent to restrain

23 'governmental snooping' and compilation of 'cradle to grave'

24 'dossiers of American citizens.' The restraint on governmental

25 snooping is accomplished by the availability of injunctive relief

26 for invasion of privacy." <u>Id.</u> (citation omitted).

27     With due respect for the Court of Appeals as an expositor of

28 California law, this Court disagrees.  First, the <u>Richardson-</u>

13

1  <u>Tunnell</u> court does not explain *how* injunctive relief alone is

2  supposed to restrain governmental misuse of private information,

3  given that in many cases, this one included, an injunction would be

4  moot by the time the case was fully litigated.  Second, the court's

5  cursory citation to a few words in the voter information pamphlet

6  does not explain how providing government agencies or employees a

7  blanket immunity to constitutional tort liability would further

8  article I, § 1's broader policy goals.  The amendment to the

9  California Constitution was not intended solely to prevent

10  "government snooping" or the creation of "dossiers."  As proponents

11  of the amendment explained, the ability to "control circulation of

12  personal information" is "essential to social relationships and

13  personal freedom."  California Secretary of State, Ballot Pamphlet

14  26, 27 (November 1972), <u>available at</u>

15  http://repository.uchastings.edu/cgi/viewcontent.cgi?article=1761&c

16  ontext=ca_ballot_props.  That the amendment was designed to reach

17  "private businesses" as well as the government shows that the scope

18  of concerns motivating the amendment was broader than mere

19  government monitoring.  <u>Id.</u>  <u>See also</u> <u>White v. Davis</u>, 13 Cal. 3d

20  757, 775 (1975) (finding in the legislative history at least four

21  "mischiefs" the amendment was intended to address, including "the

22  improper use of information properly obtained for a specific

23  purpose, for example . . . *the disclosure of it to some third*

24  *party*") (emphasis added).  Moreover, while proponents acknowledged

25  that the right embodied in the amendment was not absolute, they saw

26  its reach as being limited by "compelling public necessity."

27  Ballot Pamphlet at 28.  The <u>Jacob B.</u> court explained the unusually

28  important policy considerations surrounding the litigation

14

1   privilege, which probably supported an implicit finding of

2   compelling necessity in that narrow context.[6]  But neither the

3   Richardson-Tunnell court nor Defendants have explained what

4   compelling public necessity is served by giving government actors

5   broad immunity from constitutional claims for damages.[7]

6        While the Court is bound by the California Supreme Court's

7   holding in Jacob B., it is not bound by Richardson-Tunnell, and it

8   comes to a different conclusion as to the statutory immunities

9   provided by the GCA.  Defendants are not entitled to a defense of

10  statutory immunity.[8]

11  _____

12      [6]"The litigation privilege furthers the vital public policy of
    affording free access to the courts and facilitating the crucial
13  functions of the finder of fact.  This policy exists even if a
    privacy cause of action invokes the Constitution . . .  The same
14  compelling need to afford free access to the courts exists whatever
    label is given to a privacy cause of action."  Jacob B., 40 Cal.
15  4th at 962 (citations and internal quotation marks omitted).

16      [7]At least one California appellate court, albeit pre-Jacob B.,
    has explicitly recognized that the constitutional tort is not
17  necessarily subject to the same limitations as other privacy torts:
    "The [ballot pamhplet] indicates that the interests traditionally
18  embraced by the tort of invasion of privacy now come within the
    protection of article 1, section 1, although *the limits of the tort*
19  *cause of action do not necessarily represent limits to an action*
    *taken for violation of the constitutional right*."  Urbaniak v.
20  Newton, 226 Cal. App. 3d 1128, 1137 (1991) (emphasis added).

21      [8]Even if there were statutory immunity, it is doubtful that it
    would protect the individual Defendants here.  Defendants assert
22  immunity under Cal. Gov't Code § 820.8, which provides public
    employees immunity from liability for the acts of others.
23  Defendants' theory is that § 820.8 protects Cate and Beard from
    liability under respondeat superior and protects the other
24  Defendants from liability for the actions of Plaintiff's fellow
    inmates.  But Cate and Beard are not being sued under a respondeat
25  superior theory; they are being sued for allegedly failing to
    create adequate procedures and failing to properly train prison
26  staff.  As to the other Defendants, by its plain language § 820.8
    does not "exonerate[] a public employee from liability for injury
27  proximately caused by his own negligent or wrongful act or
    omission."  This is true even where other persons are the direct
28  cause of the injury, if their actions are a clearly foreseeable
                                                    (continued...)

15

**2.    Elements of a Constitutional Right to Privacy Claim**

To establish a claim for violation of the right to privacy under article I, § 1, a plaintiff must establish "(1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy." <u>Hill v. Nat'l Collegiate Athletic Assn.</u>, 7 Cal. 4th 1, 39-40 (1994).

The parties apparently agree, and so does the Court, that this case turns on the third prong—whether Defendants' conduct constituted a serious invasion of privacy. (Mot. Dismiss at 15; Opp'n at 10; Reply at 7.) To be "serious," the invasion must constitute an "egregious breach of the social norms underlying the privacy right." <u>Hill</u>, 7 Cal. 4th at 37. Plaintiffs must show more than an intrusion upon reasonable privacy expectations. "Actionable invasions of privacy also must be 'highly offensive' to a reasonable person . . . ." <u>Hernandez v. Hillsides, Inc.</u>, 47 Cal. 4th 272, 295 (2009).

Because the intrusion on privacy must be egregious and highly offensive, an accidental disclosure (of the kind that is inevitable when human beings process large amounts of information) is not necessarily sufficient to sustain a claim under article I, § 1. The Northern District of California has stated, for example, that "[e]ven negligent conduct that leads to theft of highly personal information, including social security numbers, does not approach

---

[8](...continued)
consequence of the public employee's act or omission. <u>See Roberts v. California Dep't of Corr.</u>, No. 2:13-CV-07461-ODW JC, 2014 WL 1308506, at *3 (C.D. Cal. Apr. 1, 2014) (section 820.8 does not shield a corrections officer who gives hostile prisoners access to another prisoner's cell knowing that they are likely to stab him).

1  the standard of actionable conduct under the California

2  Constitution . . . ."  In re iPhone Application Litig., 844 F.

3  Supp. 2d 1040, 1063 (N.D. Cal. 2012).

4      On the other hand, public policy concerns may counsel setting

5  a lower threshold for "egregious violations of social norms" when

6  it comes to certain types of information.  So, for example, article

7  I, § 1 prohibits disclosure of medical information, including HIV

8  status, because disclosure can "subvert a public interest favoring

9  communication of confidential information" to medical personnel,

10 both for treatment purposes and for their own safety.  Urbaniak v.

11 Newton, 226 Cal. App. 3d 1128, 1140 (1991).  Public policy is

12 sometimes embodied in statutes, Lloyd v. Cnty. of Los Angeles, 172

13 Cal. App. 4th 320, 329 (2009), and there is a California statute on

14 point here.  California Health & Safety Code § 120980(c) imposes

15 criminal penalties on anyone negligently disclosing the results of

16 an HIV test if the disclosure "results in economic, bodily, or

17 psychological harm to the subject of the test".  A breach of

18 privacy serious enough to support criminal charges is, almost by

19 definition, an egregious violation of social norms.  Thus, even

20 negligent disclosure of HIV-positive status can be an egregious

21 violation of social norms if it causes harm–including psychological

22 harm–to the patient.  Here, Plaintiff alleges that he experienced

23 "humiliation, fear, embarrassment . . . mental anguish, and

24 suffering," as well as the threat of bodily harm from other

25 prisoners.  (TAC ¶ 84.)  Plaintiff's allegations are sufficient to

26 plausibly describe an egregious breach of social norms.

27      Because even the allegation of a negligent disclosure can

28 sustain an article I, § 1 claim for breach of privacy under these

17

circumstances, allegations of a deliberately indifferent failure to
attempt to retrieve the missing records must, *a fortiori*, sustain a
claim as well.

Plaintiff has stated a claim for breach of privacy in
violation of the California Constitution, and the Motion to Dismiss
is denied as to this claim.

**C.   Punitive Damages**

Defendants argue that Plaintiff's request for punitive damages
should be stricken because Plaintiff has not alleged either "evil
motive" or a "reckless and callous indifference to federally
protected rights." (Mot. Dismiss at 19.) Plaintiff, however,
argues that a finding of deliberate indifference to a substantial
risk of serious harm is the same thing as a finding of callous
indifference to a constitutional right. (Opp'n. at 13.)
Defendants do not take the matter up further in their Reply.

Plaintiff's equivalence is not self-evidently correct. One
can be indifferent to a risk of harm without necessarily being
indifferent to a constitutional right. Nonetheless, in <u>Smith v.</u>
<u>Wade</u>, the Supreme Court affirmed a punitive damages award in a case
where the district court instructed the jury that such damages
could only be awarded on a finding of "reckless or callous
disregard of, or indifference to, the rights *or safety* of others."
461 U.S. 30, 33 (1983) (emphasis added). The Court repeated the
district court's "safety" language in its own opinion, explaining
why a recklessness standard for punitive damages does not undermine
the qualified immunity of corrections officers: "The very fact that
the privilege is qualified reflects a recognition there is no
societal interest in protecting those uses of a prison guard's

18

1  discretion that amount to reckless or callous indifference to the

2  rights *and safety* of the prisoners in his charge."  <u>Id.</u> at 55

3  (emphasis added).  Thus, <u>Smith</u> seems to suggest that reckless

4  indifference to safety also supports an award of punitive damages.

5       "Before a motion to strike is granted the court must be

6  convinced that there are no questions of fact, that any questions

7  of law are clear and not in dispute, and that under no set of

8  circumstances could the claim or defense succeed."  <u>RDF Media Ltd.</u>

9  <u>v. Fox Broad. Co.</u>, 372 F. Supp. 2d 556, 561 (C.D. Cal. 2005).

10 Plaintiff alleges that Defendants acted with deliberate

11 indifference to a substantial risk to his safety, and his

12 allegations could also give rise to an inference of indifference to

13 his rights.  Given the Court's reading of <u>Smith</u> and the possibility

14 that it will be shown that Defendants acted with reckless disregard

15 for Plaintiff's rights or safety or both, the Court cannot say at

16 this point that there is no set of circumstances under which

17 Plaintiff's claim to punitive damages could succeed.  The motion to

18 strike is denied.

19 **D.   Declaratory Judgment**

20      Defendants also move to strike Plaintiff's request for "an

21 order Declaring Defendants conduct unconstitutional."  (TAC,

22 "Request for Relief," ¶ 2.)  Plaintiff notes that a finding of

23 unconstitutionality is "an element of Plaintiff's first cause of

24 action," (Opp'n at 15:7-8), and the Court therefore interprets the

25 request as, essentially, an elaboration of the prayer for judgment.

26 ///

27 ///

28 ///

**IV.   CONCLUSION**

For the above reasons, the Court GRANTS the Motion to Dismiss as to the claims against Defendant Logan and DENIES the motion as to all other Defendants.


IT IS SO ORDERED.



Dated: November 18, 2014

DEAN D. PREGERSON

United States District Judge